| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: June 20, 2018 3:12 PM<br>FILING ID: 81B4443622B9B<br>CASE NUMBER: 2018CV32295 |
| **Plaintiff:**<br><br>P2BINVESTOR, INCORPORATED | |
| **Defendant:**<br><br>HOME DEPOT U.S.A., INC. | |
| | ▲ COURT USE ONLY ▲ |
| PHILLIPS LEGAL, P.C.<br>James N. Phillips, # 33114<br>2701 Lawrence St., Ste. 106<br>Denver, CO 80205<br>Phone:   (720) 465-5056<br>E-mail:  jphillips@phillipslegalpc.com<br><br>Attorney for Plaintiff | Case Number:<br><br><br><br>Ctrm/Div: |
| **COMPLAINT** | |

Plaintiff P2BInvestor, Incorporated respectfully submits this Complaint.

## I.   PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff P2BInvestor, Incorporated ("P2BI") is a Colorado corporation and has its principal place of business in the City and County of Denver, Colorado.

2.      Defendant Home Depot U.S.A., Inc. ("Home Depot") is a Delaware corporation that is registered to do business in Colorado and has its principal place of business in Atlanta, Georgia.

3.      This court has subject matter jurisdiction and personal jurisdiction over all parties.

4.      Venue is proper pursuant to pursuant to C.R.C.P. 98(c)(1)-(2).

## II.   GENERAL ALLEGATIONS

5.      Cagney Global Logistics, Inc. ("Cagney Global") entered into a contract to provide shipping services to Home Depot ("Shipping Contract").

6.      Cagney Global provided shipping services to Home Depot under the Shipping Contract and invoiced Home Depot for the services.

7.      P2Bi entered into a Financing and Security Agreement ("Financing Agreement") with Cagney Global Logistics, Inc. to provide a loan to Cagney Global in exchange for an assignment to P2Bi of certain accounts receivable owed to Cagney Global under the Shipping Contracts.  A copy of the Financing Agreement is attached as Exhibit 1.

8.      P2Bi paid funds to Cagney Global in accordance with the Financing Agreement and otherwise complied with its obligations under the Financing Agreement.

9.      Cagney Global provided a notice of assignment of the accounts to Home Depot. A copy is attached as Exhibit 2.

10.      Home Depot has acknowledged and approved the assignment and began making payments to P2BI in Colorado.

11.      On October 19, 2017, Cagney Global filed for bankruptcy in the Bankruptcy Court for the Northern District of Texas.

12.      At or about that same time, Home Depot stopped making payments to P2BI pursuant to the assignment of the accounts receivable owed under the Shipping Contract.

13.      P2BI has made demands on Home Depot to resume payments.

14.      Home Depot has refused to make any further payments.

15.      P2BI has petitioned the bankruptcy court for relief from the automatic stay in the Cagney Global Bankruptcy to permit it to pursue this lawsuit to collect the accounts owed by Home Depot.

16.      The bankruptcy court granted such relief on May 22, 2018, authorizing P2Bi to pursue recovery against Home Depot on the accounts listed in Exhibit 3 hereto.

17.      All of the accounts listed in Exhibit 3 are past due.

18.      The amount owed by Home Depot on these accounts is $1,435,199.30.

## III.   CLAIM FOR RELIEF

19.      P2BI incorporates the above allegations as if fully set forth herein.

20. Home Depot owes $1,435,199.30 (excluding interest, attorney fees, and costs) to P2Bi.

21. P2Bi is entitled to judgment in the amount due.

### IV. **PRAYER FOR RELIEF**

WHEREFORE, P2Bi prays for judgment in its favor against Home Depot on its Claim for Relief in an amount to be determined at trial together with costs, attorney fees, and pre-judgment interest and post-judgment interest.

Respectfully submitted June 20, 2018.

*s/ James N. Phillips*
James N. Phillips, # 33114

ATTORNEY FOR PLAINTIFF

Plaintiff's Address
1120 Lincoln St., Ste. 100
Denver, CO 80203

08/26/2015 WED 16:37 FAX 001
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

# FINANCING AND SECURITY AGREEMENT

This Financing and Security Agreement ("the Agreement") dated as of August 20, 2015 is between P2Binvestor, Incorporated, a Colorado Corporation ("P2Bi or P2Binvestor"), and Calling Global 1143220829 Inc., a Colorado corporation ("Client"). The Client and P2Bi (collectively, "Parties") agree as follows.

**Purpose of Agreement.** The Client desires a working capital facility for its business, supported by, *inter alia*, the sale and assignment of accounts, which P2Bi has agreed to provide in accordance with the terms of the Agreement. The Agreement is for a commercial purpose and not for any household, family or personal use.

## ARTICLE I
Financing Process

**1.01 Facility:** In accordance with the terms of the Agreement, P2Bi shall from time to time make advances to Client against a maximum advance facility, so long as the total of all advances outstanding and applicable reserves do not exceed $4,000,000.00 (the "Maximum Facility"). Advance amounts may be repaid and, subject to the terms of this Agreement, re-advanced at any time during the term of this Agreement.

**1.02 Rate Guarantee:** If at any time during the Term of the Agreement (Section 7), Client receives and delivers to P2Bi a written and binding letter of intent from a Federal or State chartered Bank offering Client financing at a lower financing commission or discount rate than those contained in Section 1.09 of the Agreement, and P2Bi opts not to match the lower financing commission or discount rate in the offer within three (3) business days, Client may terminate the Agreement, subject to the payment obligations in Section 7.03 and Section 7.04 · below, provided, however, that P2Bi must be paid off in full within 30 days of the delivery of the competing offer to P2bi by Client. P2Bi may, in its discretion, cease purchasing Accounts or making financing advances against the Maximum Facility on receipt of the competing offer.

**1.03 Calculation of Available Facility:** The Parties agree the Maximum Facility available to Client shall be established based on an "Advances Formula" which includes as a component (a) eighty percent (85%) of accounts (as that term is defined in the Uniform Commercial Code as adopted in Colorado (the "UCC" and such accounts are referred to herein as "Accounts") sold to P2Bi which comply with all the representations and warranties herein and are either deemed or may be presumed by P2Bi based on P2Bi's reliance on the representations and warranties, to be acceptable in P2Bi's sole discretion ("Acceptable Accounts"), (b) zero percent (0%) of the landed cost value of finished goods inventory ("Inventory"), but, unless otherwise agreed in writing by P2Bi, only up to an amount equal to 0% of the Advances Formula value of the Acceptable Accounts ("Acceptable Inventory") and (c) 0% of the depreciated value of other physical and/or liquid assets of the Client as determined by P2Bi in its sole discretion ("Other Assets"), but, unless otherwise agreed in writing by P2Bi, only up to an amount equal to 0% of the Advances Formula value of the Acceptable Accounts ("Acceptable Other Assets") (the total Acceptable Accounts. total Acceptable Inventory and total Acceptable Other Assets together are the "Available Facility") not to exceed the Maximum Facility. The Available Facility may be modified from time to time based on Client's business conditions, subject to P2Bi's standard underwriting approval. P2Bi will set applicable sub-limits for each of Client's customers ("Account Payor"), and for each category of finished goods inventory.

**1.04 Advances Formula Prioritization:** Client shall draw all available funds under the Advances Formula first from Acceptable Accounts prior to drawing any available funds under the Acceptable Inventory or Acceptable Other Assets components of the Advances Formula, with P2Bi in its sole discretion determining if draws requested by Client against the Acceptable Inventory and/or Acceptable Other Assets must first be made against the Acceptable Accounts component of the Advances Formula. Any available funds that Client draws under the Advances Formula against Acceptable Inventory or Acceptable Other Assets must be utilized by Client to pay for Inventory purchases and/or purchases of Other Assets required by Client to effect the normal course of its business operations. Any such available funds may not be used to pay for general operating expenses of the Client unless agreed in writing in advance by P2Bi.

1

**EXHIBIT**

**1**

DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

**1.05   Assignment and Sale of Accounts:** Client hereby sells assigns and conveys to P2Bi all of its right, title and interest in and to all Accounts to P2Bi in respect to which advances are made. A certified schedule of current Accounts, Inventory and Other Assets (each, a "Schedule") shall be submitted to P2Bi by Client at the time of each request for financing against the Maximum Facility initiated by a current Advances Formula Certificate, but in no case less than once per month. The Advances Formula Certificate shall be executed in a fashion similar to the requirements of Section 302 of the Sarbanes-Oxley Act of 2002 or rules adopted in connection therewith.

**1.06   Advances Formula Certificate:** A request for financing hereunder shall be initiated by Client by submission to P2Bi of an advances formula certificate ("Advances Formula Certificate") certifying the current outstanding total Accounts, Acceptable Accounts, total Inventory, Acceptable Inventory, total Other Assets and Acceptable Other Assets, and certifying that all such Acceptable Accounts, Acceptable Inventory and Acceptable Other Assets comply with the terms of this Agreement and all such Accounts, Inventory and Other Assets meet the definition of Acceptable Accounts, Acceptable Inventory or Acceptable Other Assets (as the case may be) under this Agreement together with a request for funding which shall not cause outstanding obligations to exceed the Maximum Facility.

**1.07   Purchase Price:** After P2Bi's election to purchase, and in exchange for the assignment and sale of an Account to P2Bi, P2Bi shall pay Client the Net Purchase Price as provided herein. "Net Purchase Price" means an amount equal to the gross face amount of such Account less (i) the P2Bi Discount (Section 1.08) and (ii) any other charges with respect to such Account and less any amount of any trade discounts, credits or allowances, or any other reductions or adjustments to such Account taken by the Account Payor.

**1.08   Payment of Purchase Price:** Provided no Event of Default has occurred hereunder, P2Bi shall pay the Net Purchase Price for each Account purchased hereunder as follows:

  (a)  Upon assignment and sale of an Account to P2Bi, and receipt of all required documents and upon fulfillment of the requirements of the Agreement, P2Bi shall (i) advance to the Collected Reserve, an internal ledger account established by P2Bi as defined in Section 2.01 of the Agreement, 85% of the face amount of the Account less stated trade discounts offered by the Client to the Account Payor or (ii) credit to the Available Facility such amount (the "Advance").

  (b)  After collection of an Account by P2Bi, P2Bi shall credit the payment to Client's account first to accrued discount and fees, then to Client's other obligations hereunder and then to the Collected Reserve as defined in Section 2.01 of this Agreement. In the event P2Bi receives payment on an Account which has not been purchased by P2Bi, such payment will be credited to the Client's Collected Reserve and released in accordance with the Agreement.

  (c)  Client will not use money from any Advance to retire or otherwise serve to reduce any debt, including those identified on its balance sheet that are subordinate or subordinated to that of P2Bi, including any Promissory Notes held by managers, related companies, shareholders or other investors, without P2Bi's prior written consent.

  (d)  Client will not, without first obtaining the consent of P2Bi, borrow any money from any person in excess of Twenty-five Thousand and 00/100 Dollars ($25,000.00) in the aggregate, except pursuant to this Agreement.

  (e)  Client will not, without P2Bi's prior written consent, directly or indirectly make or acquire any beneficial interest in, or make any loan or capital contribution to any third party.

  (f)  Except as disclosed to P2Bi, Client shall not directly or indirectly enter into or permit to exist any transaction with any affiliate of Client.

  (g)  Client will not, without P2Bi's prior written consent, guarantee or otherwise become liable with respect to the obligations of any third party and Client will not make any distributions or declare or pay any dividends (whether in cash or stock), on, or purchase, acquire, redeem or retire any of Client's capital stock.

Initial: 

08/26/2015   WED 16:38   FAX                                                                                   ☒003
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

**1.09   P2Bi Discount:**   In exchange for the financial accommodations and services provided by P2Bi under the Agreement, Client agrees to pay P2Bi a financing fee equal to (i) 0.0493% daily on the outstanding balance of Advances against the Maximum Facility (the "P2Bi Discount"). If an Event of Default (as defined below) occurs, P2Bi may increase the P2Bi Discount by fifty (50%) percent.

**1.10   Repayment:**   Client shall pay P2Bi the accrued Discount on the last business day of each month. Client shall pay P2Bi immediately if for any reason the outstanding balance on the Maximum Facility exceeds the Available Facility. At the end of the Term, Client will repay P2Bi in accordance with article VII hereof.

**1.11   Origination Fee:**   In order to, *inter alia*, reimburse P2Bi for the time and expense P2Bi incurs in its due diligence, Client shall pay a one-time origination fee in the amount of $60,000.00 out of the initial funding under the Agreement.

**1.12   Client Inventory Appraisal Fee:**   While any (a) funds are available to Client in connection with Acceptable Inventory and/or Acceptable Other Assets under the Advances Formula, or (b) advances are outstanding in connection with Acceptable Inventory and or Acceptable Other Assets, Client shall pay on demand any fees incurred in connection with periodic Client Inventory appraisal, auditing and monitoring conducted by P2Bi in its sole discretion.

**1.13   Miscellaneous Fees:**   Client shall pay the following fees for administrative activities related to Account Purchases: Cashier's checks - $18, FedEx/UPS deliveries - $15, returned checks - $25, wire transfers - $20. Fee amounts will be updated from time to time on the www.p2bi.com website, and such updated fees will apply from date of first publication. Miscellaneous fees may be deducted from payments made under Section 1.06 above, or be deducted from the Client's Collected Reserve at P2Bi's sole discretion.

**1.14   Credit Reports:**   Client acknowledges and agrees that P2Bi may from time to time at its discretion run such further credit reports and other reports as it may deem necessary to continue to keep itself apprised regarding the continued financial condition of Client and hereby authorizes P2Bi to run such credit and other reports from time to time as P2Bi deems appropriate.

**1.15   Sole Property:**   Once P2Bi has purchased an Account, any and all payments from the account debtor on the Account (the "Account Payor") as to that Account are the sole property of P2Bi pursuant to C.R.S.A. § 4-9-318.

**1.16   Optional Trade Credit Insurance:**   Client will reimburse P2Bi if optional trade credit insurance is procured for an annual amount as agreed-to by the Parties. Purchase of trade credit insurance limits the Client's liability due to a failure by an Account Payor to pay based on any risk covered by the trade credit insurance. All claims payments that may be made by a trade credit insurance company will be payable exclusively to P2Bi which P2Bi will deposit into the Collected Reserve. If Client opts to purchase such credit insurance, the cost of the premium shall be an obligation of Client to P2Bi under the Agreement and may be charged to the Collected Reserve.

**1.17   Book Entry:**   Client shall, immediately upon the sale of Accounts to P2Bi, make proper entries on its books and records disclosing the sale of said Accounts to P2Bi on said books and records and provide or execute, as the need may require, any other documents necessary to fully disclose P2Bi's interest as may be requested by P2Bi.

**1.18   P2Bi Reporting:**   Provided no Event of Default has occurred under the Agreement which is not waived, in writing, by P2Bi, and provided that there are no unexpected interruptions of power or other technological issues, P2Bi shall provide customer with on-line access to information relating to transactions and activity under the Agreement including purchases, collections, and amounts credited to and/or charged against the Collected Reserve. Should the Collected Reserve report indicate a deficit balance, Client shall pay such deficit plus accrued interest to P2Bi immediately. P2Bi may provide Client, electronically through a website portal or otherwise, with information on the Accounts purchased and a monthly reconciliation of the relationship such as aging, posting, error resolution and making of statements or make such information available. All of the foregoing shall be in a format and in such detail, as P2Bi, in its sole discretion, deems appropriate. P2Bi's books and records and electronically stored information shall be admissible in

08/26/2015 WED 16:39  FAX                                                                           ☒004
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

evidence without objection as to authenticity, hearsay or otherwise and shall be admissible as prima facie evidence of the status of the Accounts purchased and any non-purchased Accounts and the Collected Reserve between P2Bi and Client. Each statement, report, or accounting rendered or issued by P2Bi to Client and all electronically stored information shall be deemed conclusively accurate and binding on Client unless within fifteen (15) days after the date of issuance or, in the case of electronically stored information, the first of each month, Client notifies P2Bi to the contrary by registered mail, certified mail, or e-mail, setting forth with specificity the reasons why Client believes such statement, report, or accounting or electronically stored information is inaccurate, as well as what Client believes to be correct. Client's failure to receive any monthly statement or access the electronically stored information shall not relieve it of the responsibility to request such information and Client's failure to do so shall nonetheless bind Client to whatever P2Bi's records or electronically stored information report.

## ARTICLE II
### Operational Provisions

**2.01    Collected Reserve:**  The "Collected Reserve" is P2Bi's internal non-depository ledger account to which credits, debits and disbursements will be made in accordance with the Agreement.  Provided there is no Event of Default hereunder, or any event which with the passage of time or notice would be an Event of Default, any available ledger entry credit balance identified in the Collected Reserve shall be applied to Client's obligations hereunder.  Any fee, charge or other obligation of the Client under the Agreement may be charged against this Collected Reserve. P2Bi may apply any available ledger credit balance reflected in the Collected Reserve to reduce any obligations of the Client to P2Bi under the Agreement and P2Bi may charge any such obligations against the Collected Reserve in its sole discretion.  Three (3) days will be added to the date in which Client is given access to any payment unless a payment is received by electronic transfer in which event this three (3) day period shall not apply.  Any negative balance in the Collected Reserve must be paid immediately and if not paid, will accrue interest at the rate of 30% per annum.

**2.02    Required Forms:**  When Client offers an Account to P2Bi for sale, P2Bi shall receive (a) a notice of assignment of Accounts to Account Payor in a form satisfactory to P2Bi and signed by an authorized representative of Client, (b) an original invoice or an electronic equivalent thereof, either of which must be in a form acceptable to P2Bi in its sole discretion, (c) evidence satisfactory to P2Bi of the completion of performance by Client acceptable to Account Payor and (d) any other document which P2Bi may require in its reasonable discretion.

**2.03    Remittance Information Notice:**  P2Bi will notify all Account Payors that payment on all Accounts must be made to P2Bi.  Client shall make a notation on each original invoice (or the electronic equivalent of an invoice), or other such documentation acceptable to P2Bi, for each Account which indicates that such Account has been transferred, assigned and sold to P2Bi with the following language:

This is your invoice. To ensure proper credit, payment must reference the CGL invoice number and must be sent to:

| | |
|---|---|
| **Mail instructions:** | Cagney Global Logistics, Inc. |
| | C/O P2Binvestor, Inc. |
| | PO Box 173704, |
| | Denver, CO 80217-3704 |
| | |
| **ACH/Wire Instructions:** | Routing Number: 107001232 |
| | Account Number: 1900239339 |
| | Account Name: P2Binvestor for Cagney Global Logistics, Inc. |
| | Financial Institution: |
| | ANB Bank |
| | 3033 E 1st Ave |

Cagney Global Logistics FSA                                     -4-                                          Initial: ___

08/26/2015 WED 16:39 FAX                                                                            ☒005
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

Denver, CO 80206

In the event any invoice (or the electronic equivalent of an invoice) is sent or transmitted to any Account Payor without the required notation, a missing notation fee equal to two and one half percent (2.5%) of the face amount of such invoice shall be assessed.

**2.04    Misdirected Payments:** Whenever any payment on any Account comes into Client's possession, Client shall hold such payment in trust and safekeeping, as the property of P2Bi, and immediately, and in no event greater than two (2) business days, turn such payment over to P2Bi in the same form as it was received by Client. Client shall pay a misdirected payment fee equal to fifteen percent (15%) of the amount of any payment (but in no event less than $200.00) of an Account purchased (and, after the occurrence of an Event of Default, the payment of any Account) which has been received by Client and not delivered in kind to P2Bi within two (2) business days, or, if payment was made electronically, within two (2) business days of the date final payment is made. The misdirected payment fee shall equal thirty percent (30%) of the amount of any such payment received that, in whole or in part, was due to any action taken by Client causing such payment to be made to Client. Further, Client shall segregate and hold in trust and safekeeping, as the property of P2Bi, and immediately turn over to P2Bi, any goods or inventory returned to, reclaimed or repossessed by the Client which are covered by an Account purchased by P2Bi.

**2.05    Invalidation of Sale and Warranty Indemnification:** If any representation, warranty or covenant as provided in Sections 4.01, 4.02 or 4.03 is breached or proves to be untrue or a Commercial Dispute arises in respect to a purchased Account, the assignment and sale of each such effected Account shall be deemed invalidated and voidable at the option of P2Bi. Upon P2Bi's exercise of such option, Client shall immediately pay P2Bi the Advance fee less any amounts collected from the Account Payor on the Account plus the P2Bi Discount and all commercially reasonable fees, costs and expenses associated with such Account ("Repurchase Price"). P2Bi may (but is not required to) charge the amount owed against the Collected Reserve or funds otherwise available to Client under the Agreement.

**2.06    P2Bi Settlement of Accounts:** P2Bi may settle any Commercial Dispute with any Account Payor of Client if Client does not repurchase the Account. Such settlement does not relieve Client of any obligation (including any repurchase obligation) under the Agreement with respect to any Accounts.

**2.07    Information:** In the event P2Bi provides financial information to Client regarding a third party, whether by setting a purchase limit, at the request of Client or otherwise, Client understands that P2Bi is not making any representations or warranties or expressing an opinion as to the creditworthiness of any such third party and Client will not disclose such information to any third party including but not limited to the Account Payor.

**ARTICLE III**
**Security Interest**

**3.01    Security Interest/Collateral:** As further inducement for P2Bi to enter into the Agreement, Client grants to P2Bi, as collateral for the repayment of any and all obligations and liabilities whatsoever of Client to P2Bi, a continuing first priority ownership interest in each of the Accounts purchased pursuant to section 1.06 and in order to secure Client's performance of all monetary and non-monetary obligations under the Agreement, a first priority security interest in the following described property, as defined under the Uniform Commercial Code:  All now owned or hereafter acquired property including, but not limited to, cash or cash equivalents including funds of Client's in P2Bi's possession for any reason, accounts, general intangibles (including, but not limited to, patent rights, trademark rights and copyright rights in all countries, software, and all rights in and to domain names in whatever form, and all derivative URLs), equipment, investment property, deposit accounts, inventory, instruments, chattel paper, documents, insurance proceeds, and all books and records pertaining to accounts as well as the Collected Reserve established hereunder, and accounts or funds of Client's in P2Bi's possession for any reason, and all proceeds of the foregoing property (the "Collateral").

Cagney Global Logistics FSA                        -5-                        Initial:

08/26/2015 WED 16:40 FAX                                                            ☒006
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

Notwithstanding any contrary term of this Agreement, Collateral shall not include any waste or other materials that have been or may be designated as toxic or hazardous.

**3.02    Security Documents:**  Client shall execute, and deliver to P2Bi, as P2Bi may reasonably request from time to time, any and all documents that P2Bi may require in order to enable P2Bi to duly perfect its ownership rights in the Accounts purchased and security interest in the Collateral.  Client authorizes P2Bi to file a UCC financing statement with any appropriate authority reflecting its ownership interest in the Accounts purchased and its security interest in the Collateral and further authorizes P2Bi to file other filings including amendments (other than amendments adding collateral) as P2Bi deems appropriate.

## ARTICLE IV
### Client's Representations, Warranties and Covenants

**4.01    Representations and Warranties.**  Client hereby represents and warrants and as follows:

(a)  Client is properly licensed, qualified and authorized to operate its business and Client's trade name(s), all of which are disclosed on Clients application provided to P2Bi, and all documents have been properly filed and published as required by applicable law.  Client, and the persons executing this document, are duly authorized to execute and deliver the Agreement and all other documents required to be executed and delivered hereunder.  Client's chief executive office is at the location(s) set out under Client's name on the signature pages to the Agreement.  All other places of business have been disclosed on the application provided to P2Bi.

(b)  Client is solvent and is not subject to any proceeding under the United States Bankruptcy Code, any form of state insolvency proceeding, Assignment for the Benefit of Creditors, receivership, or other similar proceeding (an "Insolvency Proceeding").

(c)  Client has made, and shall continue to make, timely payment and remittance to applicable governmental authorities of all taxes and other amounts required to be paid and remitted by Client pursuant to applicable law.

(d)  Client is, at the time of purchase of each Account or of any Advance against Inventory and/or Other Assets by P2Bi, the lawful owner of and has good and undisputed title to such Account, Inventory or Other Assets.  Each Account at the time of purchase, and all Inventory and/or Other Assets at the time of an Advance against Inventory and/or Other Assets, is free from any security interest, restriction, assignment (whether absolute or by way of security), tax lien, payment or performance bond or other lien (statutory or otherwise) or any other encumbrance of any kind or nature whatsoever (together "Liens"), that have not been previously disclosed, in writing, to P2Bi.  Each Account offered for sale to P2Bi conforms to the representations, warranties and terms set forth herein, net of any credits or allowances of any nature.  All Inventory and/or Other Assets conforms to the representations, warranties and terms set forth herein.

(e)  Each Account Payor's business is, to the best of Client's information and knowledge, solvent and actively doing business at the time of the Agreement and at the time each Account is presented to P2Bi for purchase.

(f)  No Account offered by Client is owed by any Government Unit unless approved in writing by P2Bi.

(g)  Each Account is payable in United States dollars and each Account Payor is a United States entity unless otherwise approved in writing by P2Bi.

(h)  No Account is owed by an owner, shareholder, subsidiary, affiliate, officer or employee of the Client nor does Client own or control the Account Payor or the business of any Account Payor on Accounts to be sold by Client to P2Bi.

(i)  No Account offered by Client has been restructured, extended, amended or modified nor does any Account include finance charges, service charges or sales or excise taxes;

(j)  Each Account offered by Client is, and will until paid remain, an accurate and undisputed statement of indebtedness owed by Account Payor to Client for a certain sum which is due and payable in thirty (30) days or less, or within such term as is agreed to by P2Bi and Client, is for a true sale, delivery and acceptance of merchandise or performance of services which have been received and finally accepted by the Account Payor.  No such Account so offered has been invoiced, paid or partially paid in advance of the full delivery and acceptance of goods or the performance and acceptance of services or in advance of the submission of the Account to P2Bi.  Client has all rights

Cagney Global Logistics FSA                          -6-                          Initial: 

DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

to transfer or sell such Accounts to P2Bi and such Accounts are payable by Account Payor without offset, deduction or counterclaim.

(k) All financial records, statements, books or other documents shown to P2Bi by Client at any time, either before or after the signing of the Agreement, are true and accurate and all financial records are kept in accordance with Generally Accepted Accounting Principles (GAAP).

(l) There are no actions or proceedings pending by or against Client before any court or administrative agency, and there are no pending, threatened, or known to be imminent litigations, governmental investigations or claims, complaints, or prosecutions involving Client, and Client is not bound by the terms of any settlement agreement, consent decree, or the like relating to formerly pending, pending, or threatened actions, proceedings, or prosecutions involving Client, except as heretofore disclosed in writing to P2Bi

(m) The execution and performance by Client of the terms and provisions of the Agreement, and the execution and delivery of any other documents required to be executed and delivered hereunder, have been duly authorized by all requisite company action, and neither the execution nor the performance of the Agreement or any other documents required to be delivered hereunder, will violate any provision of law, any order of any court or other agency of government, the governing documents of Client, or any agreement or other instrument to which Client is a party, or by which Client is bound, or result in breach of, or constitute (with due notice or lapse of time or both) a default under, or result in the creation or imposition of any Lien upon any of the property or assets of Client, pursuant to any such agreement or instrument, except as provided hereunder. Client agrees that it will execute and perform all terms hereunder.

(n) Client shall at all times maintain its books and records to accurately reflect on its books the absolute sale of the Accounts to P2Bi

(o) All filings or other actions required under applicable law, including but not limited to securities law, have been made or shall be made as required by applicable law.

**4.02   Negative Covenants.** Client agrees as follows:

(a) Client will not under any circumstances or in any manner whatsoever, interfere with any of P2Bi's rights under the Agreement.

(b) For the duration of the Agreement and for any period thereafter for as long as any obligation to repurchase or indebtedness whatsoever remains owing by Client to P2Bi, Client will not sell or assign Accounts to any party other than P2Bi without the prior written approval of P2Bi.

(c) Client shall not pledge, transfer or grant any additional consensual Lien on the Collateral including any purchase money security interest nor shall Client consent to the placement of any additional Lien by any other party on any Collateral for the term of the Agreement and for as long as Client may be required to repurchase any Account or is indebted to P2Bi hereunder without the written consent of P2Bi.  Client shall provide written notice to P2Bi immediately upon obtaining any knowledge, from any source, of the assertion, filing, recording or perfection by any means, of any non-consensual Lien against the Collateral.

(d) Client will not change or modify the terms of the original invoice or agreement with the Account Payor or the order of payment on Accounts sold to P2Bi without prior consent in writing from P2Bi.

(e) Client shall not be involved in a material dispute with an Account Payor, meaning any dispute or claim, other than a credit dispute covered by effective credit insurance obtained by P2Bi at Client's expense with respect to Client's Accounts, (including, without limitation, any alleged dispute as to price, invoice terms, quantity, quality or late delivery and claims of release from liability, counterclaim or any alleged claim of deduction, offset, or counterclaim or otherwise) in connection with an Account or any other transaction related thereto, which dispute relates to an Account other than a credit problem ("Commercial Dispute"). Any dispute, regardless of the validity or lack thereof, with an Account Payor, including any Account which remains unpaid, in whole or part, beyond ninety (90) days during the term of the Agreement, shall be deemed and presumed to be a Commercial Dispute for purposes of the Agreement.

(f) Client shall not breach any representations, warranties or covenants in the Agreement.

(g) Client shall not intentionally contribute to, or aggravate any difficulty any Account Payor may have in paying Accounts to P2Bi.

Cagney Global Logistics FSA                    -7-                    Initial: 

08/26/2015 WED 16:41 FAX @008
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

(h) Client shall not exceed the Maximum Facility.

**4.03    Affirmative Covenants.** Client agrees as follows:

(a) Client shall cooperate and assist P2Bi, or any collection agency retained by P2Bi, in any way P2Bi reasonably requests in connection with the collection of any Account or in otherwise resolving disputes with Account Payors.

(b) Client shall maintain a minimum account balance in its operating bank account in the amount of $10,000.00 and provide P2Bi with (i) automated electronic notification directly from the financial institution if such minimum account balance is not maintained; and (ii) monthly bank statements with respect to such account

(c) Client will maintain such insurance covering Client's business and/or the property of the Account Debtors as is customary and adequate for businesses similar to the business of Client in an amount as is sufficient to compensate for reasonably foreseeable loss, and promptly pay all premiums with respect to the policies covering such insurance. Further, the Client shall have P2Bi named as loss payee for such insurance.

(d) Client will immediately notify P2Bi of any dispute between any Account Payors or suppliers and Client, the return of any Goods by Account Payor to Client or the return of any Inventory by Client to a supplier.

(e) Client will notify P2Bi in writing prior to any change in the location of any of its places of business, including the location of the Client's inventory or, if Client has or intends to acquire any additional place of business. Client will not change its chief executive office or the office or offices where Client's books and records concerning Accounts are kept without prior written consent of P2Bi. Client will not remove any Collateral from the jurisdictions in which the Collateral is located on the date of the Agreement without the prior written consent of P2Bi.

(f) Client will immediately notify P2Bi in writing prior to implementation of any proposed change of Client's name, identity, legal entity, corporate structure, business dissolution, use of any additional trade name, or any proposed change in any of the officers identified in the Certificate of Incumbency provided to P2Bi, or the principals, partners, shareholders and/or owners of Client and Client will not effect any such change without P2Bi's written consent.

(g) Client will immediately notify P2Bi of the filing of any Lien against Client. Client will immediately notify P2Bi in writing of the commencement of any material legal proceeding or service of any legal document materially affecting the Client including, but not limited to, any complaints, judgments, attachments, garnishments or any Insolvency Proceeding against Client. Client will notify P2Bi in advance of the filing of any Insolvency Proceeding by Client.

(h) At least once per month, Client will furnish to P2Bi financial statements, including but not limited to a statement of profit and loss, a balance sheet, a statement of cash flows, an A/R ageing report and any other information reasonably requested by P2Bi. At the request of P2Bi, Client will provide P2Bi with a certificate from Client's insurance company confirming the existence of the insurance and the designation of P2Bi as loss payee.

(i) Client shall immediately notify P2Bi of any claim, loss or offset of any kind against Client or P2Bi asserted by any Account Payor or other third party during the Agreement.

(j) Client shall immediately pay any obligations of Client to P2Bi that exceed the Maximum Facility.

(k) Client shall promptly pay, any and all expenses of storing, warehousing, insuring, handling and shipping of Client's property, any and all excise, property, sales and other taxes (providing P2Bi with evidence of payment thereof) levied or imposed by any governmental or taxing authority on Client or on any of Client's property or any property caused to be given to P2Bi as security, and any amounts owing to any third party that could give rise to any liens on any of Client's property or any property caused to be given to P2Bi as security. If Client fails to promptly pay when due, whether to P2Bi or any other person, monies which Client is required to pay under any requirement of this Agreement, P2Bi may, but need not, pay the same and charge Client's Collected Reserve therefore or, in P2Bi's exclusive discretion, demand reimbursement from Client. Any and all sums shall become additional indebtedness owing to P2Bi, shall bear interest at the rate provided in Section 1.08 hereof and shall be secured by the Collateral P2Bi need not inquire as to, or contest the validity of, any such expense, tax, security interest, encumbrance or lien, and the receipt for the payment thereof from the appropriate governmental agency or other entity shall be conclusive evidence that the same was validly due and owing.

(l) Upon P2Bi's request, Client shall now and from time to time hereafter, but not less frequently than monthly, execute and deliver to P2Bi a summary designation of Inventory from Client's and from all public warehouses, specifying the cost and, if applicable, the market value of Client's raw materials, work in process and finished goods, and further specifying such other information as P2Bi may reasonably request, with all monthly

Cagney Global Logistics FSA                    -8-                    Initial:

DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

information due within fifteen (15) days of month end. Client shall promptly, in writing, notify P2Bi if any of Client's Inventory contains any labels, trademarks, trade-names or other identifying characteristics which are the properties of third parties.

(m) Client shall require and use its best efforts to ensure compliance by all of its business operations with all applicable Environmental Laws (as defined in Paragraph (p) below). Client agrees to defend, indemnify, save, and hold P2Bi and its officers, employees, and agents harmless against all obligations, demands, claims, and liabilities claimed or asserted by any other person arising out of or relating to discharges or releases of Hazardous Substance or Hazardous Waste (both as defined in Paragraph (p) below) into the environment, including ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substance or Hazardous Waste or the clean-up or other remediation thereof, and all losses (including without limitation attorneys' fees and legal and other costs from outside counsel or in-house counsel) in any way suffered, incurred, or paid by P2Bi as a result of or in any way arising out of, following, or consequential thereto; provided, however, that no such indemnification shall apply with respect to any liability directly arising out of the gross negligence or willful misconduct on the part of P2Bi or any of its officers, employees and agents in connection with Hazardous Waste or Hazardous Substance.

(n) "Environmental Laws" means all federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions relating to the environment or to emissions, discharges or releases of pollutants, contaminants, petroleum or petroleum products, chemicals or industrial, toxic or hazardous substances or waste into the environment, including ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, petroleum or petroleum products, chemicals, or industrial, toxic or hazardous substances or waste or the clean-up or other remediation thereof, including without limitation 42 U.S.C. 9601 (14), Comprehensive Environmental Response, Compensation and Liability Act of 1980 set forth at 42 U.S.C. 9601 et seq. ("CERCLA"), or the Resource Conservation and Recovery Act of 1986 set forth at 42 U.S.C. 9601 et seq. ("RCRA") and all successor statutes and amendments thereto. "Hazardous Substance" or "Hazardous Waste" means any hazardous waste or hazardous substance, as defined in 42 U.S.C. 9601 (14) or any successor statute, all as amended from time to time.

(o) Client will cause to have executed and deliver to P2Bi such agreements, documents, and instruments as P2Bi may deem reasonably necessary or desirable to protect P2Bi's interests in the Collateral at each location where Inventory is maintained including without limitation, UCC-1 Financing Statements and waivers with an acknowledgement of P2Bi's senior and exclusive security interest from any landlord, Bailee, or warehouseman in form and substance satisfactory to P2Bi. The Collateral, however, shall not at any time now or hereafter be stored with a landlord, Bailee, warehouseman, or similar party without P2Bi's prior written consent and P2Bi's receipt of the above waivers with an acknowledgement from the third party that it is holding the Collateral for the benefit of P2Bi and will exclusively seek payment from Client and not P2Bi of all obligations owing.

(p) Client has the risk of loss of the Collateral. P2Bi shall not be liable or responsible for the safekeeping of any Collateral. P2Bi shall not be responsible for any lost profits of Client arising from any breach of contract, tort, or any other wrong arising from the establishment, administration, or collection of the Client's financial obligations. P2Bi has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral.

(q) On or before the financing under the Agreement, Client's principals, including Thomas Cagney, shall deliver to P2Bi personal guaranties guarantying all obligations and indebtedness owed by Client to P2Bi under the Agreement and any related documents and each such person's signatures shall be duly notarized.

## ARTICLE V
### Default

**5.01   Events of Default:** Any one or more of the following shall be an Event of Default (an "Event of Default") hereunder:

(a)   Client shall fail to pay any indebtedness to P2Bi when due or timely satisfy any representation, warranty or covenant indemnification obligation when required hereunder.

DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

(b)   Client shall breach any term, provision, promise, warranty, representation, or covenant under the Agreement, or under any other agreements or contracts between Client and P2Bi.

(c)   The appointment of any receiver or trustee of all or a substantial portion of the assets of Client.

(d)   Client shall become insolvent or unable to pay debts as they mature, or Client shall voluntarily commence any Insolvency Proceeding affecting Client.

(e)   Any involuntary Insolvency Proceeding shall be filed against Client and is not dismissed within sixty (60) days.

(f)   Any levies, attachment, executions, or similar legal process shall be issued against the Collateral.

(g)   Any financial statements, profit and loss statements, or schedules, other statements or documents furnished by Client to P2Bi are or become false or incorrect in any material respect.

(h)   Any documents submitted by Client to P2Bi for the purchase of an Account are untrue, erroneous, or fraudulent in any respect regardless of materiality or if the Client fails to submit any document required by P2Bi under the Agreement for the purchase of that Account.

(j)   Any guarantor of Client's obligations hereunder is in default under the guaranty or if any guarantor seeks to withdraw or revoke a guaranty as to future sales of Accounts or otherwise.

## ARTICLE VI
### Remedies

**6.01    Remedies on Default:** Upon the occurrence of an Event of Default, P2Bi may, in accordance with the UCC and applicable law, do any one or more of the following:

(a)   Accelerate and declare immediately due and payable, all indebtedness of Client to P2Bi, whether mature, contingent or otherwise, including without limitation (i) outstanding purchased Accounts and (ii) all other fees, costs and expenses as required hereunder.

(b)   Cease purchasing any Account under the Agreement, and cease providing any financing under the Advances Formula.

(c)   Notify any Account Payor and take possession of Collateral and collect any Account without judicial process.

(d)   Settle any disputed Account directly with the Account Payor without relieving Client of its obligations with respect to such Account under the Agreement.

(e)   Cure any Client default hereunder in its sole discretion at Client's expense.

(f)   Require Client to assemble the Collateral and the records pertaining to Accounts and make them available to P2Bi at a place designated by P2Bi.

(g)   Enter the premises of Client and take possession of the Collateral and of the records pertaining to the Accounts and any other Collateral.

(h)   Grant extensions, compromise claims and settle an Account for less than face value, all without prior notice to Client.

(i)   Use, in connection with any assembly or disposition of the Collateral, any trademark, trade name, trade style, copyright, patent right or technical process used or utilized by Client.

(j)   Initiate electronic credit or debit entries through the ACH system to and from Client's deposit account maintained by Client wherever located.

(k)   Hold Client liable for any deficiency for any amounts due and owing to P2Bi.

(l)   Cease making reports, accountings or the accessibility to any website portal P2Bi makes available to the Client.

(m)   P2Bi shall be entitled to any form of equitable relief that may be appropriate, including, but not limited to, injunctive or receivership remedies, without having to establish any inadequate remedy at law or other grounds other than to establish that its Collateral or the Accounts purchased are subject to being improperly used, dissipated, concealed or in any way withheld from P2Bi.

(n)   Client waives any requirement that P2Bi post or otherwise obtain or procure any bond, whether required under state or federal law or any statute or rule of court. In the event P2Bi, in its sole and exclusive

DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

discretion, nonetheless desires to procure and post a bond, P2Bi may procure and file with the court a bond in an amount up to and not greater than $10,000.00 notwithstanding any common or statutory law requirement to the contrary and upon P2Bi's posting of such bond it shall be entitled to all benefits at law as if such bond was posted in compliance with law. Client waives any right it may be entitled to, including an award of attorney's fees or costs, in the event any equitable relief sought by and awarded to P2Bi is thereafter, for whatever reason(s), vacated, dissolved or reversed.

(o)   All post-judgment interest shall bear interest at the highest rate allowed by law unless no such rate is established, in which event the amount of the P2Bi Discount; otherwise, whichever is greater.

(p)   All of Client's rights of access to any online, internet services that P2Bi makes available to Client, shall be provisional pending Client's curing of all Events of Default. During such period of time, P2Bi may limit or terminate Client's access to P2Bi's online services. Client acknowledges that the information P2Bi makes available to Client constitutes and satisfies any duty to respond to a Request for an Accounting or Request regarding a Statement of Account that is referenced in § 9-210 of the UCC.

(q)   The Parties acknowledge that it shall be presumed commercially reasonable and P2Bi shall have no duty to undertake to collect any non-purchased Account or Accounts purchased including those in which P2Bi receives information from an Account Debtor that any form of a Commercial Dispute exists. In the event P2Bi undertakes to collect from or enforce an obligation of Payor and ascertains that the possibility of collection is outweighed by the likely costs and expenses that will be incurred, P2Bi may at any such time cease any further collection efforts and such action shall be considered commercially reasonable. Before Client may, under any circumstances, seek to hold P2Bi responsible for taking any uncommercially reasonable action, Client shall be required to first notify P2Bi, in writing, of all reasons why Client believes P2Bi has acted in any uncommercially reasonable manner and advise P2Bi of the action that Client believes P2Bi should take.

(r)   Change the address for delivery of mail to P2Bi and to receive and open mail addressed to Client and to the extent mail appears to be unrelated to P2Bi's interests, make such mail available to Client for pick-up or otherwise transfer such mail to Client which duty to transfer such mail shall commence thirty (30) days after P2Bi first receives physical possession of Client's mail.

(s)   Exercise any remedy provided by law or equity.

## ARTICLE VII
### Term and Termination

**7.01    Term:**  The "Term" of the Agreement shall be one years from the date of the Agreement, and shall renew automatically for one year periods on the anniversary of the date of the Agreement unless either Party informs the other of its intention to terminate the Agreement with sixty (60) days prior written notice. The Agreement shall continue in full force and effect until the earliest of (a) the expiration of the Term; (b) any other date agreed to in writing by the parties hereto; (c) sixty days from written notice from P2Bi to Client or Client to P2Bi of an intent to terminate, or (d) any date set by P2Bi upon the occurrence of an Event of Default, or (e) the later of the date upon which P2Bi opts not to match a binding and bona fide competitive financing offer received by Client from a third party per Section 1.02 above and all obligations of Client to P2Bi under the Agreement are paid in full

**7.02    Effect of Early Termination:**  Should Client terminate the Agreement before the end of the then current Term, Client shall pay a sum equal to $40,000 ("the Early Termination Fee"). The Parties acknowledge that this Early Termination Fee is not a penalty but constitutes the anticipated or presumed damages that P2Bi will likely suffer but would otherwise be difficult to prove and that the Early Termination Fee is reasonable and not greatly disproportionate to P2Bi's presumed loss. If the parties mutually terminate the agreement pursuant to subsection 7.01 (b), or if P2Bi terminates the Agreement pursuant to subsection 7.01 (o) above and no Event of Default has occurred, or if the Agreement is properly terminated by Client under subsection 7.01 (e) above, assuming that all Client obligations have been paid in full, the Early Termination Fee shall be waived by P2Bi.

Cagney Global Logistics FSA                         -11-                          Initial: _____

08/26/2015 WED 16:44 FAX                                                                                  ☑012
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

**7.03    Payment of Obligations:** On the date of termination, all obligations owing by the Client to P2Bi and all charges and fees provided herein shall be accelerated and become immediately due and payable in full without further notice or demand.

**7.04    Satisfaction of All Obligations:** Upon termination of the Agreement, Client shall fully satisfy all outstanding indebtedness and obligations owing to P2Bi which include Client's duty to pay the Repurchase Price of any and all Accounts, whether disputed or undisputed, as may be requested by P2Bi.

**7.05    No Lien Termination without Release.** In recognition of P2Bi's right to have its attorneys' fees and other expenses incurred in connection with the Agreement secured by the Collateral and notwithstanding payment in full of all obligations by Client, Client shall not be authorized to receive and P2Bi shall not be required to file any UCC Financing Statement terminating or satisfying P2Bi's Security Interest in the Collateral unless and until all obligations owing to P2Bi are satisfied and Client executes an unconditional full general release in favor of P2Bi. Client understands that this provision constitutes a waiver of its rights under §9-513 of the UCC.

**7.06    Repayment of Account Payor:** In the event P2Bi receives a demand to repay or is required to repay any Account Payor (or its successor) for a payment received by P2Bi on an Account, the amount of the demand or repayment by P2Bi shall be an obligation of Client to P2Bi notwithstanding the termination of the Agreement. In the event the Client receives a payment from P2Bi to which the Client has no rights, repayment of the funds to P2Bi is an obligation of the Client to P2Bi whether or not the Agreement has been terminated. In either event, if the obligation is not paid upon five (5) business days' notice of the obligation to pay from P2Bi to Client, in the event the security interest granted to P2Bi under section 3.01 had been terminated, same shall be deemed automatically re-granted to P2Bi and P2Bi may file a financing statement to re-perfect its security interest in the Collateral (if necessary) and exercise any and all rights it has under the Agreement to collect the amounts due.

## ARTICLE VIII
### Miscellaneous Provisions

**8.01    Binding on Future Parties:** The Agreement inures to the benefit of and is binding upon the heirs, executors, administrators, successors and assigns of the parties hereto except that the Client shall not have the right to assign its rights hereunder or any interest herein without P2Bi's prior written consent.

**8.02    Cumulative Rights:** No failure or delay by P2Bi in exercising any right, power or remedy under the Agreement, or documents given in connection with the Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under the Agreement. The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

**8.03    Power of Attorney:** In order to carry out the Agreement and avoid unnecessary notification of Account Payors, Client irrevocably appoints P2Bi, as its special attorney in fact, or agent, with power to strike through Client's remittance information on all invoices delivered to Account Payors and note P2Bi's remittance information on all invoices, receive, open, read, and thereafter forward to Client if appropriate all mail addressed to Client (including any trade name of Client) sent to P2Bi's address, sign Client's name on any notice of assignment, financing statement, amendment to any financing statement and on any notices to Account Payors, endorse the name of Client or Client's trade name on any checks or other evidences of payment that may come into the possession of P2Bi with respect to any Account and/or do any and all things necessary and proper to carry out the purposes intended by the Agreement. These powers shall remain in full force and effect until all assigned Accounts are paid in full and any indebtedness of Client to P2Bi is paid in full.

**8.04    Waiver:** P2Bi may not waive its rights and remedies unless the waiver is in writing and signed by P2Bi. A waiver by P2Bi of a right or remedy under the Agreement on one occasion is not a waiver of the right or remedy on any subsequent occasion.

Cagney Global Logistics FSA                         -12-                         Initial:

DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

**8.05    Invalid Provisions:** Any provision of the Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

**8.06    Entire Agreement:** This instrument contains the entire Agreement between the parties with respect to the subject matter hereof. The Agreement, together with the documents given in connection herewith, comprises the complete and integrated agreement of the parties on the subject matter hereof and supersedes all prior agreements, written or oral, on the subject matter hereof.

**8.07    Amendment:** Except as otherwise provided herein, any addendum or modification hereto must be signed by both parties.

**8.08    Effective:** The Agreement becomes effective when it is accepted and executed by an authorized officer of P2Bi.

**8.09    Data Transmission:** P2Bi assumes no responsibility for privacy or security risks as a result of the method of data transmission selected by Client. P2Bi only assumes responsibility for data transmitted from Client once the data is received within P2Bi's internal network. P2Bi assumes no responsibility for privacy or security data transmitted from P2Bi to Client once the data is dispensed from P2Bi's internal network.

**8.10    Information:** P2Bi may publish information regarding Client on its private, investor-only website regarding the Client's business, financial data, volume of sales, Account Payor's and similar information. P2Bi may share information regarding Client with its agents, accountants, attorneys, advisors and with all direct and indirect subsidiaries or affiliates of P2Bi. Client agrees P2Bi may make reasonable use of the Client's logo and company description in promotional materials, on social media, and on the P2Bi.com website in order to highlight the Client, feature the Client in success story blog posts, promote the Client, and share the Client's story. Client's consents herein shall survive termination of this Agreement until such time that Client delivers, and P2Bi receives, written revocation of such consents.

**8.11    Indemnification:** Client agrees to indemnify and hold P2Bi harmless from any and all liability, claims and damages, including attorneys' fees, costs of suit and interest which P2Bi may incur as a result of the failure of Client to pay withholding taxes due and payable to any taxing authority.

**8.12    Release:** Client hereby releases and exculpates P2Bi, P2Bi's officers, employees, agents, designees, attorneys, directors, shareholders, and accountants (the "P2Bi Parties") from any liability arising from any acts under this Agreement, the documents executed in connection with this Agreement or subsequent to this Agreement or in furtherance thereof (each individually and collectively the "Loan Documents"), whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for gross negligence or willful misconduct, but in no event shall the P2Bi Parties have any liability to Client for lost profits or other special or consequential damages. Client agrees to indemnify the P2Bi Parties against, and hold each of them harmless from, any liability of any kind or nature, including attorneys' fees and P2Bi's Expenses which may be imposed upon, incurred by, or asserted against any of the P2Bi Parties, in any way relating to or arising out of this Agreement or the transactions contemplated hereby, except to the extent of any liability caused by any of the P2Bi Parties' gross negligence or willful misconduct.

**8.13    Hold Harmless:** Client shall hold P2Bi harmless against any Account Payor ill will arising from P2Bi's collecting or attempting to collect on any Account, provided that P2Bi acts in a commercially reasonable manner.

**8.14    Notices hereunder:** All notices and communications hereunder shall be given or made to the parties at their respective addresses set forth below, or at such other address as the addressee may hereafter specify for the purpose of written notice to the other party hereto. Such notices and communications shall be effectively given by P2Bi when and if given in writing and delivered to the address set forth herein, delivered by electronic mail, facsimile or duly deposited in the mail with first-class postage prepaid.

Cagney Global Logistics FSA                           -13-                                  Initial:

DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE
DocuSign Envelope ID: FEEA2B14-103D-4434-AD15-BA3576B39ECE

| | |
|---|---|
| If to P2Bi: | P2Binvestor Incorporated |
| | 899 Logan Street, Suite 210 |
| | Denver, CO, 80203 |
| | Attn: G. Krista Morgan |
| | Email: kmorgan@p2bi.com |
| If to Client: | Cagney Global Logistics, Inc. |
| | P.O. Box 612126 |
| | Dallas, TX 75261 |
| | Attn: Brenda Cagney |
| | Email: brenda.cagney@cagneyglobal.com |

**8.15  Costs and Expenses:** Except as is prohibited by law, the Client agrees to pay on demand all commercially reasonable costs and expenses, including (without limitation) attorneys' fees, incurred by P2Bi in connection with the Agreement, including, but not limited to, the enforcement of any security interest granted hereunder, the collection of any Account or collection of any obligation owed by Client to P2Bi. Notwithstanding the existence of any law, statute or rule, in any jurisdiction which may provide Client with a right to attorney's fees or costs, Client hereby waives any and all rights to hereafter seek attorney's fees or costs hereunder and Client agrees that P2Bi exclusively shall be entitled to indemnification and recovery of any and all attorney's fees or costs in respect to any litigation based hereon, arising out of, or related hereto, whether under, or in connection with, this and/or any agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either party.

**8.16  Field Examinations:** The Client hereby agrees to pay P2Bi, on demand, reasonable field examination fees in connection with any field examinations or inspections conducted by P2Bi of any Collateral or the Client's operations or business at the rates established from time to time by P2Bi as its field examination fees, together with all actual out-of-pocket costs and expenses incurred in conducting any such field examination or inspection. If no Event of Default has occurred, field examinations will take place no more than once yearly.

**8.17  Miscellaneous:**

(a) This Agreement shall be deemed to be one of financial accommodation and not assumable by Client, as debtor or debtor-in-possession, or any trustee in any bankruptcy proceeding without P2Bi's express written consent and may be suspended in the event a petition in bankruptcy is filed by or against Client.

(b) In the event any of Client's principals including, but not limited to its equity holders, officers or directors, during the Term of the Agreement or while Client remains liable to P2Bi for any obligations under the Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, cause to be formed a new entity or otherwise become associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Client, or, Client transfers any interest in the Accounts purchased to any other person or entity or otherwise authorizes such person or entity to use any of the Client's Collateral or any interest in the Accounts purchased, such entity shall be deemed to have expressly assumed the obligations due P2Bi under the Agreement. With respect to any such person or entity, P2Bi shall be deemed to have been granted P2Bi an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as Debtor, an initial UCC Financing Statement and to have it filed with any and all appropriate UCC filing offices. P2Bi shall be held harmless by Client and its principals and be relieved of any liability as a result of P2Bi's authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or Security Interests in such entity's assets. P2Bi shall have the right to notify such entity's Payors of P2Bi's rights, including without limitation, P2Bi's right to collect all Accounts and Payment Intangibles, and to notify any creditor of such entity that P2Bi has such rights in such entity's assets.

Cagney Global Logistics FSA                                    -14-                                    Initial: _____

(c) Each of Client's principals who have executed the Agreement or any other document in connection therewith acknowledge that the duty to accurately complete each Schedule is critical to the Agreement and as such all duties with respect thereto shall at all times be non-delegable. Each of Client's principals acknowledge that he/she shall remain fully responsible for the accuracy of each Schedule delivered to P2Bi regardless of who is delegated the responsibility to prepare and/or complete each such Schedule.

(d) Client shall at any time during the term, fully complete and execute, as taxpayer, one or more form 8821 (Rev. April 2004) and/or form 4506 (Rev. October 2008) or form 4506-T (Rev. January 2008) issued by the Department of the Treasury, Internal Revenue Service or such other forms as may be requested by P2Bi, irrevocably authorizing P2Bi to, among other things, inspect or receive tax information relating to any type of tax, tax form, years or periods or otherwise desired by P2Bi on an ongoing basis. Client shall take no action of any kind that causes or may cause a revocation of P2Bi's right to receive such information.

(e) Client will cooperate with P2Bi in obtaining a control agreement in form and substance satisfactory to P2Bi with respect to Collateral consisting of Deposit Accounts if so requested by P2Bi.

**8.18   CONSENT TO JURISDICTION AND VENUE IN COLORADO**: THE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF COLORADO WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF. CLIENT HEREBY SUBMITS TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO OR THE JURISDICTION OF ANY COLORADO STATE COURT IN THE CITY AND COUNTY OF DENVER FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OR RELATING TO THE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. CLIENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH CLIENT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**8.19   WAIVER OF JURY TRIAL**: THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Executed and accepted on the day and year first written above:

**Cagney Global Logistics, Inc.**                    **P2Binvestor, Incorporated**

By: _____                          By: _____
          Signature                                              Signature

By:   Thomas Cagney                                   By:   G. Krista Morgan

Its:   Chief Executive Officer                        Its:   Chief Executive Officer



**9000 N. Royal Lane, Suite A**
**Irving, Texas 75063**
**817-865-7170**

DATE FILED: June 20, 2018 3:12 PM
FILING ID: 81B4443622B9B
CASE NUMBER: 2018CV32295

Dear Valued Customer:

One of the hallmarks of our organization is the continual search for ways to innovate, automate, and simplify. We are always looking for ways to offer you a better value and more services, at the best possible value.

We are pleased to announce the implementation of electronic payment processing for all of our customers. While there is very little change for you (other than a new mailing address), this automation will allow us to spend even more time focused our outstanding client support and innovating new services.

Effective immediately, please update your accounts payable systems to remit payments to us at this address:

**If Mailed:**
Cagney Global Logistics, Inc.
c/o P2Binvestor, Inc.
PO Box 173939,
Denver, CO 80217-3939

**If ACH/Wired:**
Routing Number: 121000248
Account Number: 4123827099
Account Name: Cagney Global
Logistics, Inc. c/o P2Binvestor
Swift/ABN: WFBIUS63

Financial Institution:
Wells Fargo
1740 Broadway
Denver, CO 80274

This new processing address is for all currently outstanding invoices as well as all future invoice payments. If you need a reprinted invoice or invoices with this new remit to address printed on the invoice, please don't hesitate to contact us and we'll be happy to supply.

If you have any questions about this notice, please feel free to call us!

Sincerely,

Tom Cagney
President/CEO

**EXHIBIT**

**2**

# P2Binvestor



1120 Lincoln St, Ste 100
Denver, CO 80203

9000 N. Royal Lane, Suite A
Irving, Texas 75063

*As of August 20, 2015*

ATTN: Accounts Payable Manager

RE: **Cagney Global Logistics – Notice of Assignment of Accounts**

Dear Accounts Payable Manager:

Cagney Global Logistics has been approved for a line of credit to fund their growth from P2Binvestor, Inc. (P2Bi). As part of this financing arrangement, Cagney Global Logistics has outsourced their accounts receivable to P2Bi. Please update your payment records on all invoices now and in the future as follows:

**IF PAID BY REGULAR MAIL:**
Cagney Global Logistics
℅ P2Binvestor, Inc.
PO Box 173939
Denver, CO 80217-3939

**IF PAID BY EXPRESS MAIL:**
Lockbox Services 173939
Cagney Global Logistics ℅ P2Binvestor Inc.
MAC C7301-L25
1740 Broadway St - LL2
Denver, CO 80274-0001

**IF PAID BY ACH/WIRE:**
**Routing Number:** 121000248
**Account Number:** 4123827099
**Account Name:**
Cagney Global Logistics ℅ P2Binvestor, Inc.
**Swift/ABN:** WFBIUS6S
**Financial Institution:** Wells Fargo
1740 Broadway
Denver, CO 80274

For questions about payment information, please contact Kara Morrissey (P2Bi) at ops@p2bi.com or by phone at (720) 361-1500.

Sincerely,

Kara Morrissey
Lending Operations Manager
P2Binvestor, Inc.

Agreed and acknowledged,

Thomas Cagney
President/Chief Executive Officer
Cagney Global Logistics, Inc.

*The assignment of accounts has been duly recorded under the Uniform Commercial Code. Please make the proper notations on your books and records, acknowledge the terms and conditions of this notice and keep a copy for your records. Please take notice that pursuant to the Uniform Commercial Code, payment to any party other than P2Bi will not discharge your legal obligation to pay P2Bi whether you sign this notice or not. This notice and the instructions contained herein remain in effect until you are notified by P2Bi in writing to the contrary.*

DATE FILED: June 20, 2018 3:12 PM
FILING ID: 81B4443622B9B
CASE NUMBER: 2018CV32295

# EXHIBIT "B"

EXHIBIT

3

Cagney Global Logistics
A/R Aging Summary
10/12/2017

| Status | approved | | | | | |
|---|---|---|---|---|---|---|

| Row Labels | Sum of O/S Balance | Sum of <30 | Sum of 31-60 | Sum of 61-90 | Sum of 91-120 | Sum of > 120 |
|---|---|---|---|---|---|---|
| HOME DECORATOR'S COLLECTION HDC | $ 1,404,540.62 | $ 1,177,812.27 | $ 122,671.62 | $ 104,515.87 | $ (87.18) | $ (371.96) |
| BB&B | $ 194,925.41 | $ 55,435.53 | $ 80,190.36 | $ 59,299.52 | $ - | $ - |
| AEROGROW C/O CAGNEY GLOBAL | $ 132,061.97 | $ 115,081.46 | $ - | $ 16,980.51 | $ - | $ - |
| CDSLogistics | $ 62,089.42 | $ 25,621.97 | $ 36,467.45 | $ - | $ - | $ - |
| HIT ENTERTAINMENT | $ 60,451.59 | $ 29,486.75 | $ 30,964.84 | $ - | $ - | $ - |
| INOGEN | $ 56,287.17 | $ 28,042.53 | $ 28,244.64 | $ - | $ - | $ - |
| CENTURYLINK | $ 31,058.54 | $ 13,136.11 | $ 17,928.92 | $ - | $ - | $ (6.49) |
| HomeDepot | $ 30,658.72 | $ 14,113.62 | $ 9,162.11 | $ 7,382.99 | $ - | $ - |
| QUALMARK CORPORATION | $ 28,154.93 | $ 18,259.74 | $ 9,895.19 | $ - | $ - | $ - |
| CHEMICAL MARKETING CONCEPTS | $ 19,747.89 | $ 3,115.00 | $ 16,632.89 | $ - | $ - | $ - |
| KIOSK INFORMATION SYSTEMS | $ 18,673.07 | $ 17,497.07 | $ 1,176.00 | $ - | $ - | $ - |
| GARDNER DENVER THOMAS INC | $ 13,175.65 | $ 6,741.04 | $ 6,434.61 | $ - | $ - | $ - |
| NEIMAN MARCUS DIRECT - 7088 | $ 12,916.44 | $ 2,495.62 | $ 6,412.38 | $ 4,008.44 | $ - | $ - |
| GRAND WAREHOUSE | $ 10,800.00 | $ 7,425.00 | $ 3,375.00 | $ - | $ - | $ - |
| DIAMOND MATERIALS TECH INC | $ 9,842.64 | $ - | $ 9,842.64 | $ - | $ - | $ - |
| FRONTIER AIRLINES | $ 8,790.68 | $ 8,370.65 | $ 420.03 | $ - | $ - | $ - |
| UNE BELLE VIE MEMORIAL URNS | $ 7,262.02 | $ 7,262.02 | $ - | $ - | $ - | $ - |
| DROPLET MEASUREMENT | $ 6,130.23 | $ 6,130.23 | $ - | $ - | $ - | $ - |
| A MEDICORE CORPORATION | $ 5,457.80 | $ - | $ - | $ 5,457.80 | $ - | $ - |
| PLAYTIME | $ 5,420.07 | $ 5,420.07 | $ - | $ - | $ - | $ - |
| CBW AUTOMATION | $ 5,140.00 | $ - | $ 5,140.00 | $ - | $ - | $ - |
| COOKE TRUCKING | $ 4,513.62 | $ 4,513.62 | $ - | $ - | $ - | $ - |
| LAND ROVER DALLAS | $ 4,370.24 | $ 551.13 | $ 2,378.92 | $ 1,440.19 | $ - | $ - |
| IC INTERCONNECT | $ 4,342.77 | $ 4,342.77 | $ - | $ - | $ - | $ - |
| SUR LA TABLE  % STRATEGICIQ COMMERCE | $ 3,876.59 | $ 1,630.68 | $ 1,750.84 | $ 495.07 | $ - | $ - |
| CHECKERS INDUSTRIAL SAFETY | $ 3,820.56 | $ 2,595.76 | $ 1,224.80 | $ - | $ - | $ - |
| ATLAS PACIFIC ENGINEERING CO. | $ 3,511.58 | $ 3,511.58 | $ - | $ - | $ - | $ - |
| NITE IZE INC DBA RCP ENTERPRISES | $ 2,509.80 | $ 2,509.80 | $ - | $ - | $ - | $ - |
| DELIVER NOW LOGISTICS | $ 2,200.00 | $ 600.00 | $ 1,600.00 | $ - | $ - | $ - |
| HARTE HANKS LOGISTICS | $ 2,200.00 | $ - | $ 2,200.00 | $ - | $ - | $ - |
| RICOH COMPANY LTD | $ 1,869.09 | $ 1,869.09 | $ - | $ - | $ - | $ - |
| PG EXHIBITS | $ 1,792.00 | $ 1,387.00 | $ 405.00 | $ - | $ - | $ - |
| CHRISTY SPORTS | $ 1,747.07 | $ 1,747.07 | $ - | $ - | $ - | $ - |
| BROOKS USA INC. | $ 1,668.82 | $ 1,668.82 | $ - | $ - | $ - | $ - |
| WANCO | $ 1,455.97 | $ 1,455.97 | $ - | $ - | $ - | $ - |
| GLASSMITH2 LLC | $ 1,217.14 | $ - | $ - | $ 1,217.14 | $ - | $ - |
| DETECTIONTEK | $ 1,175.00 | $ 235.00 | $ 705.00 | $ 235.00 | $ - | $ - |
| PARK SUPPLY OF AMERICA INC | $ 1,072.25 | $ - | $ 1,072.25 | $ - | $ - | $ - |
| DAC VISION | $ 501.66 | $ 166.22 | $ 335.44 | $ - | $ - | $ - |
| NEWCASTLE AVIATION PARTNER | $ 347.35 | $ 347.35 | $ - | $ - | $ - | $ - |
| ELLSWORTH ADHESIVES | $ 309.00 | $ 405.00 | $ - | $ (96.00) | $ - | $ - |
| CEA MEDICAL MANUFACTURING | $ 200.00 | $ 200.00 | $ - | $ - | $ - | $ - |
| ALLEN LUND COMPANY | $ 4.50 | $ - | $ - | $ 4.50 | $ - | $ - |
| GLASS WAREHOUSE LLC | $ (225.00) | $ - | $ (225.00) | $ - | $ - | $ - |
| Grand Total | $ 2,168,064.87 | $ 1,571,189.54 | $ 396,405.93 | $ 200,941.03 | $ (87.18) | $ (378.45) |

**From:** **Steve Carlyle** info@frlps.com
**Subject:** ?
**Date:** June 25, 2018 at 3:53 PM
**To:** Sway Sway@comcast.net



Hi

a package arrived today in the ups store--just an fyi- mc

--


**Front Range Legal Process Service**
Phone: (888) 387-3783 - Fax: (877) 772-7377
info@frlps.com

**Serving you Nationwide with Offices in:**
Denver, CO | Review this office
Fort Collins, CO | Review this office
Tampa, FL | Review this office
Dallas TX | Review this office

**More office locations:**
Rapid City, SD, Chicago IL, Omaha NE, Las Vegas NV, Salt Lake City UT, Cheyenne WY

**CONFIDENTIALITY NOTICE:** This electronic transmission (including any files attached hereto) contains information that is legally privileged, confidential, and exempt from disclosure. It is intended for use only by the individual or entity named above. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, copying, distribution, or the taking of any action in reliance on the contents of this confidential information is strictly prohibited. If you have received this communication in error, please destroy it, remove it from your computer and/or network, and immediately notify me by email. Thank you. Receipt by anyone other than the named recipient(s) is not a waiver of any attorney-client, work product or other applicable privilege, protection or doctrine.